UNITED STATES DISTRICT COURT
District of Minnesota
Criminal No. 20-196 (ADM)

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ABDELHAMID AL-MADIOUM,<br><br>Defendant. | GOVERNMENT'S POSITION<br>ON SENTENCING |

The United States of America, through its attorneys, Andrew M. Luger, United States Attorney for the District of Minnesota, and Assistant United States Attorney Andrew R. Winter, respectfully submits its Sentencing Position in this case. After consideration of all the facts of this case, as well as the United States Sentencing Guidelines (hereinafter the "U.S.S.G."), and the factors set forth at Title 18, United States Code, Section 3553(a), the United States believes that a sentence of 144 months imprisonment followed by a term of supervised release is sufficient, but not greater than necessary, to achieve justice in the sentencing of this defendant.

## I. INTRODUCTION

In the early morning hours of July 8, 2015, Abdelhamid Al-Madioum ("Defendant") abandoned everything to become a soldier for ISIS. While on a family trip to Morocco, the defendant fled his family to join and fight on behalf of one of the world's most notorious terrorist organizations. After sustaining serious injury while fighting for ISIS, he continued to serve the terrorist organization as a database administrator. Years later, when ISIS' territorial footprint had receded, the defendant was captured by the Syrian Democratic Forces ("SDF"). He was later repatriated to the United States where he pleaded guilty to Providing and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1). He now faces sentencing for his crime. After giving due consideration to the United States Sentencing Guidelines, the statutory factors found at 18 U.S.C. § 3553(a), and substantial assistance the defendant has provided to authorities since his return,[1] the government respectfully requests a sentence of 144 months imprisonment.

## II. THE FACTS[2]

### *Defendant's Path to ISIS*

The defendant is a naturalized U.S. citizen who was born in Morocco then raised in the United States since the time he was an infant. The defendant graduated in 2014 from a

---

[1] The government is providing the Court with a separate, sealed filing detailing the nature and extent of the defendant's cooperation.

[2] The United States agrees with and incorporates by reference the facts from the "Offense Conduct" section of the Presentence Report ("PSR"), ¶¶ 6-17.

suburban high school in St. Louis Park, Minnesota. He then began a college career at Normandale Community College where he worked in the college's Information Technology department. These events coincided with the rise of ISIS and the terrorist organization's unprecedented efforts to recruit foreign fighters to fill its ranks.[3] Watching ISIS videos and reading ISIS articles, the 18-year-old defendant had self-radicalized by the end of 2014. One Twitter account known to post ISIS propaganda connected the defendant to an ISIS facilitator who, in turn, provided instructions on precisely how to enter ISIS-controlled territory in Syria.

The defendant's opportunity to join the organization came during a summer break from college in July of 2015 when he traveled to Morocco to visit extended family in Casablanca. During the early morning hours of July 8, 2015, the defendant fled from his relatives' Casablanca home, leaving everything behind except his cell phone and passport. For several days before he left, he withdrew the maximum amount allowed from his bank account each day. After leaving his relatives' home, he took a taxi to the Casablanca airport where he boarded a flight to Istanbul, Turkey. There, he coordinated with ISIS facilitators

---

[3] On or about October 15, 2004, the U.S. Secretary of State designated al Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act (the "INA"). On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the INA to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary also added the following aliases to the FTO listing: the Islamic State of Iraq and al-Sham (i.e., "ISIS"—which is how the FTO will be referenced herein), the Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furqan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL, and ISIS. To date, ISIS remains a designated FTO. *See* PSR ¶ 8.

who transported him to the town of Gaziantep on Turkey's northern border with Syria. At this point, a smuggler helped the defendant cross into ISIS-controlled territory in war-torn Syria.

Upon discovering their son's disappearance, the defendant's family frantically—but vainly—tried to reach him by phone. They would also turn to Moroccan authorities, the U.S. Consulate in Rabat, and the FBI for help finding their son. Their efforts would likewise prove unsuccessful. After his family was forced to return to the U.S. without their son, his parents allowed FBI agents to search the defendant's abandoned bedroom in their St. Louis Park home. There, agents found multiple handwritten notes evidencing his long simmering and covert plans to join ISIS.

### *Defendant as Soldier*

After successfully crossing the border into Syria, ISIS members took the defendant to Iraq where, after approximately six weeks of training and indoctrination, he was assigned to the Tariq Bin Ziyad[4] ("TBZ") battalion of the Abu Mutaz al-Qurashi Division. During his tenure with TBZ, the defendant engaged in armed combat for ISIS. Two months into his tour as a foot soldier, the defendant was injured in an explosion in Anbar Province, Iraq. He broke both legs, sustained numerous lacerations from shrapnel, and lost his right arm. After approximately six months under the care of ISIS medical staff in Ramadi and Mosul, the defendant was transferred from an ISIS hospital to TBZ's guesthouse for injured fighters.

---

[4] This unit was named for a famous general, Tariq Bin Ziyad, who was known for his conquest to cross Gibraltar from Morocco to conquer Spain in 700 AD.

***Defendant as ISIS Database Administrator***

After months of convalescence, the defendant continued his service to ISIS; only now, he worked behind the scenes leveraging the computer skills he developed in the United States. Using a software program, the defendant served as a database administrator; collecting, organizing, and updating information held on TBZ fighters and their families. During this time of service to ISIS, he would marry an ISIS fighter's widow[5] and father a child with her. Approximately two years later, he would take another wife[6] and father a child with her as well.

***Defendant's Capture by Syrian Democratic Forces***

Throughout 2018 and into 2019, the SDF conducted successful military operations against ISIS in both Iraq and Syria. By March of 2019, ISIS had been territorially reduced to the area of a small village on the Syria-Iraq border named Baghouz where several thousand ISIS members, who had not surrendered or fled, remained. Cornered with no further options, the defendant surrendered to SDF forces on or about March 15, 2019. With him were his two small children.[7]

---

[5] His first wife had been married to a Chechnyan ISIS fighter who had been previously killed in battle.

[6] His second wife had been married to a Somali ISIS fighter who had been previously killed in battle.

[7] By this time, the children's mother (the defendant's first wife, Fatima) had been killed in the battle of Baghouz. His second wife had disappeared shortly after giving birth to their child on March 7, 2019.

*Defendant in SDF Custody*

Upon his capture, the defendant provided a false name to both FBI agents and SDF forces. He would also lie to agents about his role within ISIS, claiming he suffered the amputation of his arm when working in a hospital that was hit in an airstrike. He would also lie to journalists who came to the prison, claiming he had joined ISIS solely to become a doctor. Once he was positively identified by U.S. authorities, law enforcement began efforts to repatriate the defendant. Upon his return to the United States in September of 2020, after approximately 18 months in SDF custody, the defendant promptly entered a guilty plea to the single charge in the indictment. U.S. Probation prepared and filed a PSR for the Court and parties. *See* ECF Doc. 49.

### III. THE REPORT OF PRESENTENCE INVESTIGATION

The United States has no objections to the factual assertions in the PSR. The PSR calculates a base offense level of 26 for Count 1, Providing and Attempting to Provide Material Support to a Designated Foreign Terrorist Organization. PSR ¶ 26. The United States concurs that a 2-level increase is warranted under U.S.S.G. § 2M5.3(b)(1) because the offense involved the provision of material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act. PSR ¶ 27, and Plea Agreement, p. 4.

The United States also concurs that the terrorism adjustment of U.S.S.G. § 3A1.4 applies, as the parties stipulated in the plea agreement, resulting in a 12-level increase in offense level and a criminal history of Category VI. PSR ¶ 28, and Plea Agreement, p. 4. With a 3-level reduction for acceptance of responsibility, the resulting advisory guidelines

range is 360 months to life imprisonment. However, the statutory maximum penalty is twenty years, therefore the adjusted guideline term of imprisonment is 240 months, pursuant to USSG §5G1.1(a). PSR ¶ 82.

IV. **ARGUMENT**

In *Gall v. United States,* 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine an appropriate sentence. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez,* 561 F.3d 883, 886 (8th Cir. 2009). The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the court determines that a sentence outside the Guidelines range is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a). The government will seek a sentence that satisfies 18 U.S.C. § 3553(a) standard of being sufficient, but not longer than necessary, to effectuate the objectives of federal sentencing law and policy.

The nature and circumstances of the offense are detailed above. Defendant stands convicted of a crime related to international terrorism and the terrorist organization he

7

sought to assist is one of the most dangerous and violent in existence. The threat posed to the national security of the United States by the defendant's conduct is significant.

While the defendant has no prior criminal history, his conduct represents much more than a single, impulsive, or rash act. His crime involved extensive planning and research, and it required deceiving his own family for months on end. It took determination and will to leave his life and loved ones behind, fly to Istanbul, travel overland to the Syrian border, then smuggle himself into the arms of a violent terrorist organization bent on creating a caliphate at the cost of countless innocent lives. The defendant did much more than harbor extremist beliefs. He chose violent action by taking up arms for ISIS. Furthermore, this decision to join ISIS involved his own theological justification to commit murder, and if necessary, become a martyr.

The history and characteristics of the defendant do not present mitigating circumstances for this conduct. He graduated from high school in St. Louis Park and continued his studies at a local community college, where he worked part-time in the Information Technology (IT) department. Prior to his crime, the defendant was a healthy, well-educated young man with strong family support—yet he chose the path of a violent terrorist.

The Supreme Court has recognized combating terrorism as "an urgent objective of the highest order." *Holder v. Humanitarian Law Project,* 561 U.S. 1, 28 (2010). The offense's seriousness needs to be reflected in this Court's sentence, as is respect for the law and just punishment. A significant sentence in this case is also needed for individual and general deterrence. "Congress specifically made general deterrence an appropriate

consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States,* 623 F.3d 627, 632 (8th Cir. 2010) (*quoting United States v. Medearis,* 451 F.3d 918, 920 (8th Cir. 2006)). Ultimately, it is important for the public to know that those who support terrorist organizations will face serious punishment for their actions. Similarly situated defendants who traveled and fought for or otherwise served ISIS have received sentences at or near the guidelines range called for in this case. *See, e.g., United States v. Khweis,* No. 22-4406, 2023 WL 4993685, at *1-3 (4th Cir. Aug. 8, 2023) (240 months for defendant convicted under sections 2339B and 924(c)(1)(A) for defendant listed as a "fighter" in an ISIS document, who lived in safe houses in Syria and Iraq in 2016, where he assisted ISIS fighters); *United States v. Asainov*, 19-cr-402-NGG (E.D.N.Y Oct. 30, 2023), Dkt. 192 (sentence of life plus seventy years for defendant who served as sniper for ISIS in Syria convicted of multiple section 2339B offenses and obstruction of justice); *but see United States v. Musaibli*, 18-cr-20495-DML-MKM (E.D. Mich. Jun. 21, 2023) (sentence of 168 months for defendant convicted under sections 2339B and 2339D for service with ISIS's TBZ battalion, where al-Madioum testified at a pretrial hearing).

To the defendant's credit, however, he has accepted responsibility for his crime. Upon his return to the United States, he promptly pled guilty to the charge in the Indictment and his behavior while in USMS custody has been virtually without blemish. Additionally, as will be outlined in the government's sealed filing, the defendant has cooperated with U.S. authorities in several other national security investigations and prosecutions. His cooperation all weighs in favor of a sentence of imprisonment of 144 months.

Finally, in light of the seriousness of defendant's offense, the government requests that he be subject to a lifetime term of supervised release. This is consistent with sentences for other defendants in this district who attempted to travel to Syria to join ISIS, the defendant actually accomplished in this case. *See United States v. Guled Ali Omar*, 15-cr-59-MJD-HB (D. Minn. Nov. 30, 2016), ECF Doc. 782 (lifetime term of supervised release for convictions under section 2339B and other related offenses); *United States v. Abdirahman Yasin Daud*, 15-cr-49-MJD-HB (D. Minn. Nov. 30, 2016), ECF Doc. 783 (same); *United States v. Mohamed Abdihamid Farah*, 15-cr-49-MDJ-HB (D. Minn. Nov. 30, 2016), ECF Doc.784 (same).

And in consideration of the fact that defendant acknowledges having radicalized and having obtained information about supporting ISIS on the internet, PSR ¶¶ 13 & 15, his supervised release should include computer monitoring provisions consistent with what terrorism defendants have received in other cases. *See, e.g.*, *United States v. Omar*, 15-cr-59-MJD-HB, ECF Doc. 782 at 5 (prohibiting computer or internet access without prior approval, and allowing installation of computer and internet monitoring programs); *United States v. Amin*, 15-cr-00164 (EDVA), ECF Doc. 20 at 4 (allowing for screening and monitoring of internet use as directed by probation officer).

## V. CONCLUSION

For all these reasons, the United States respectfully asks this Court to sentence Defendant to a term of imprisonment of 144 months, followed by a lifetime term of supervised release.

Dated: April 17, 2024

Respectfully submitted,

ANDREW M. LUGER
United States Attorney

*s/ Andrew R. Winter*

BY: ANDREW R. WINTER
Assistant United States Attorney
Attorney ID No. 0232531