UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Crim. No. 20-196 (ADM/DJF)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **DEFENDANT'S SENTENCING** |
| v. | ) | **POSITION** |
| | ) | |
| ABDELHAMID AL-MADIOUM, | ) | |
| | ) | |
| Defendant. | ) | |

In late 2014, then eighteen-year-old Abdelhamid Al-Madioum became convinced by an expert ISIS recruiter that he needed to leave his family, his home, and his country to join ISIS. On June 23, 2015, Abdel and his family left Minnesota to visit family and friends to Morocco. While his family slept, he took his passport, phone, and wallet. His intent was to travel to Syria. As directed from the ISIS recruiter, he left Morocco and flew to Turkey. A few days later on July 8, 2015, he and others crossed into Syria. For the next five months, he trained, he fought, and was a solider for ISIS. He was severely injured by an explosion, and was not able to perform the duties of a solider. He was given ISIS administrative duties. Mr. Al-Madioum remained with ISIS until he surrendered to Syrian Democratic Forces (SDF) on March 15, 2019. He was brought to the United States on September 15, 2020. And on January 13, 2021, he pled guilty to providing material support (himself) to a designated terrorist organization (ISIS).

1

Why would an eighteen-year-old be willing to give up everything he knew and loved for an almost guaranteed death? The reasons are myriad, but when boiled down to its essence, the root cause was to help Muslims who Abdel thought were being killed by the Assad[1] regime. ISIS recruiters, though social media, provided the final push Abdel needed to travel to Syria.

Today, twenty-seven-year-old Abdelhamid Al-Madioum will stand before this Court for sentencing. He is not the same person from ten years ago. Today his is a widower, a father, physical disabled, traumatized, and a great help to the United States government. Mr. Al-Madioum's advisory guideline range is well above the statutory maximum of 20 years. Because of his cooperation with the United States Government and foreign governments, his lack of belief in ISIS ideology, other similarity situated defendants, his current family situation, and his five years of incarceration, we respectfully request a sentence of seven years followed by ten years of supervised release.

---

[1] Bashar al-Assad has been the President of Syria since 2000 and is the commander-in-chief of the Syrian Armed Forces. The United States Department of State, Bureau of Democracy, Human Rights and Labor have recognized humanitarian violations under the Assad Regime. *See: https://2009-2017.state.gov/documents/organization/186661.pdf*

## GUIDELINES AND STATUTE

The Plea Agreement and the PSR did not differ in their calculations. The total offense level is 37, the criminal history category is automatically adjusted to VI and the advisory guideline range is 360 to life. The statutory maximum penalty is twenty years which makes the advisory guideline range 240 months. The PSR finds the supervision term is from five years to life.

## OFFENSE CONDUCT

### A. The What

### Iraq

On June 23, 2015, Mr. Al-Madioum's family traveled to Morocco as they had done many times for a vacation. Unknown to his family, Abdel did not plan on vacationing with them. While his family slept, he took his passport and left the family home. Upon noticing that Abdel was not at home the following morning, his family called him on his phone, but he did not respond. Out of growing concern, his family went to the U.S. Embassy in Morocco to report him missing. The embassy investigated and found that Abdel had taken a flight to Turkey. The FBI became involved. While speaking with the FBI at the embassy, Abdel's parents gave the agents their house key and drew a map of their home, including Abdel's bedroom. This allowed the FBI to search the home so answers could be provided to the family. Meanwhile, following directions from the same ISIS recruiter, Abdel

met with others in Turkey who were going to travel to Syria to join ISIS. After three days in Turkey, he along with others were brought over to Syria. He called his family and told them he was in Syria. After that phone call, there was no communication for a long time.

After arriving in Syria, he and other recruits were taken to Mosul, Iraq. There, he was taken to training sites. The training included learning Arabic, learning ISIS ideology, and weapons training. The training lasted less than a month; but Mr. Al-Madioum was at the sites for about two months.

After his training, Mr. Al-Madioum was assigned to an ISIS battalion as a solider. His duty was frontier guarding in Anbar Province in Iraq. Within the first 20 days, he was injured in an airstrike.   He was given antibiotics and a gauze for an injury to his back. He was told to get back to duty. Almost three weeks later, an explosion occurred whereby Mr. Al-Madioum was severely injured. His injuries included the loss of his right arm below his elbow, two broken legs, a broken left heel bone, nerve damage, and shrapnel throughout his lower body. After the explosion he was in various hospitals and home care for about 5 months in Iraq. It was during this time period in early 2016 that he was introduced to his first wife, Fatima. She assisted in his recovery which included 19 surgeries in an attempt to help him recover.  He couldn't walk on his left leg until November 2018, almost three years after the explosion. He learned to write with his left hand and manage

his constant pain. He could not be a solider, so he was assigned to a new task. He was assigned to work in ISIS Administration located in Mosul, Iraq.

His new job included keeping information about ISIS members up to date. This included information about the members' families, assignments, and injuries. This duty lasted for about six months. Then, because Mr. Al-Madioum had to travel to Syria for medical treatment, his job was assigned to someone else. Sometime in late 2016 or early 2017, Mr. Al-Madioum, his wife Fatima and Fatima's son moved to Syria.

### Syria (Raqqa and Mayadin)

When Mr. Al-Madioum first arrived in Syria, he was dealing with medical issues. He was in and out of about six hospitals while in Syria. Once things stabilized for him, he was given odd jobs by ISIS that lasted a day or two. This included working in an office for injured people, working in archives, working a jail, etc. In 2017, Fatima gave birth to their son Abdelkader. Mr. Al-Madioum couldn't work, but the family received a stipend from ISIS. The stipend stopped in early 2018. So, the family supported themselves by selling cakes at the market. The family lived in poverty and constant airstrikes. Mr. Al-Madioum contracted sepsis about five times between 2017 and 2019, and was in and out of the hospital. He married his second wife, Fozia, in early 2018. Fozia had a daughter who was four years old.

The following picture is with Fatima, their sons and Fozia's daughter:



Syria was the last place Mr. Al-Madioum lived before he surrendered to the SDF on March 15, 2019.

**Summary of role in ISIS**

In total, Mr. Al-Madioum was a solider for ISIS for about 50 days in 2015. He was an administrator for about six months in 2016. In 2018, he inquired from another Twitter user the price of a firearm. The user was known to tweet prices of guns in particular areas of the world.  Mr. Al-Madioum tweeted the user in 2018 and asked the price of an assault rifle in a non-ISIS part of Syria. At the time, Mr. Al-Madioum was in southeastern Syria that was controlled by ISIS and wasn't getting paid by ISIS. He tweeted the request out of curiosity. Mr. Al-Madioum did

not intend to buy a firearm, wasn't in the area he was inquiring about, and had no money to purchase a gun.

Although Mr. Al-Madioum was not an "active" member of ISIS from 2017 onwards, he was an ISIS member (received a stipend until early 2018 from ISIS, lived in ISIS territory, communicated with his neighbors who were active ISIS members) until his surrender to the SDF in March 2019.

**B. The Why**

In late 2014, Abdel began questioning what was the point of life, how does one earn self-respect, what is after life, etc. He began to question himself. He began to read online news and social media. One social media author began to encourage Abdel to test his faith and to become a real Muslim. The author encouraged Abdel to read about the Assad Regime's horrors which included using chemical weapons against women and children. Mr. Al-Madioum felt the national news was not reporting the atrocities, and began to count more on what was sent to him by the recruiter and what he found on international news outlets. He believed that it was his obligation to travel to Syria. He felt the need to join ISIS, who he was told were helping Muslims. He was questioned with "how can you in the West sit in your bedrooms knowing that Muslims are suffering overseas." The call to travel to join ISIS, who were fighting the Assad regime, became louder. ISIS has a recruitment manual. The manual includes who to target in the West, and how to get that target

to join ISIS. Mr. Al-Madioum is right out of the manual. Sympathetic videos were sent to him, and he really thought it was his duty as a Muslim to travel to Syria and to fight against the Assad regime.  He was shown that ISIS were the good guys.



He was told that ISIS gave toys to kids and helped other Muslims. The images convinced Abdel that ISIS was doing good.



He made up his mind that he would travel to Syria, and he did so the following summer. Mr. Al-Madioum's family have wondered why they were not in their son's thoughts when he decided to leave them. Abdel was told that Muslims in the West were safe, but Muslims in the East needed him. He rationalized leaving his family knowing he was needed more overseas. Fortunately for this family, the horror came to end when Abdel surrendered to Syrian Democratic Forces (SDF).

**C. Self-Surrender**

In early 2019, ISIS was losing ground to the SDF. The SDF began pushing ISIS out of Syria. Sometime in late February or early March of 2019, Mr. Al-Madioum, Fatima and their two sons were in the village of Baghouz. He had separated from Fozia in late 2018 but saw her in Baghouz. She was pregnant with their daughter. He was later told that Fozia and his daughter had died in Baghouz. His family with Fatima was living in a makeshift tent made from plastic bags/tarps. Abdel spent a day digging a trench so his family could be protected if there was an airstrike. But Fatima was shot and killed in front of him and their sons by SDF forces or an ISIS fighter. The trench became a burial site for Fatima. The following day, he walked his sons to the SDF to surrender. This was on March 15, 2019, over five years ago.

He was placed in a SDF prison on March 16, 2019 and eventually, at his request, separated from his sons for their safety and wellbeing. American Law

Enforcement came to interrogate Mr. Al-Madioum on July 20, 2019 and August 15, 2019. He admitted to joining ISIS in 2015. He was eventually brought back to the United States in September 2020, charged, and accepted responsibility for his actions by pleading guilty without challenging the evidence. His meetings with his attorney were mostly all through Zoom because of COVID. But Mr. Al-Madioum knew that what ISIS told him was wrong and he wanted to correct his wrong. So he pled guilty and began his four years of cooperation.

Abdel has been asked numerous times as to why he did not leave ISIS after his injuries. There are two main reasons. First, he could not physically leave because of his injuries and the need for constant medical care. He would have used smugglers to help him, but the smugglers were known to give you up to ISIS. Second and most importantly, the reason he did not leave, was because he had wife and a son (in 2016); two sons (by 2017); another wife and daughter (in 2018); and two daughters (in 2019).  He could not simply pick up and leave at any given time. Fatima was a Russian citizen, and she firmly believed that the Russian government tortured and raped female ISIS members.

### D. Emotional Growth

Because Mr. Al-Madioum is facing twenty years in prison, it may seem convenient to say he no longer believes in ISIS Ideology. But Mr. Al-Madioum's disbelief in ISIS started well before his surrender and criminal charges in the case.

Abdel recalls that the first time he really began to question ISIS motives was when he was recuperating in Raqqa. He had access to the internet and was able to read the news. He read about attacks in foreign countries where civilians were being killed for no reason. He recalls going to the ISIS jail and seeing how ISIS treated their own prisoners. All of these realization began in 2017. He stopped believing in the "eye for an eye" ISIS ideology; if we kill that one guy, then they will stop killing hundreds of us. He began to realize that ISIS spun and justified so many killings. By early 2018, Mr. Al-Madioum was really disheartened by ISIS, and then they stopped providing financial support and food to many, including Abdel and his family.

So, why should this Court believe him when he says he does not support ISIS? The proof is his cooperation. A separate filing will be filed by counsel under seal describing his extreme cooperation. He has given so much information about ISIS to many governments around the world. He has publicly testified about ISIS practices. He has educated himself further about the wrongs of ISIS since being in custody for the last five years. But it is not only his denouncement of ISIS and his cooperation that supports a sentence of seven years; there are other factors.

**SENTENCING FACTORS SUPPORT A DOWNWARD VARIANCE**

Since *Booker,* sentencing courts have been called upon to fashion a sentence that not only encompasses the facts and circumstances of the offense, but addresses the history and characteristics of the offender as well. *See, e.g., Pepper v. United States*, 131 S.Ct. 1229, 1240 (2011) ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender"). (*quoting Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)).

**Family**

Section C of the PSR details Mr. Al-Madioum's background in detail. He was raised by both parents who immigrated to the United States from Morocco. In 2004, after the birth of his first brother, the family moved from New York to Minnesota. His second brother was born in 2009, and the parents began to rely on thirteen-year-old Abdel to help with childcare and household chores such as cooking and cleaning. The family was very much a typical American family. They vacationed, they played games, cooked together, and supported each other. Religion did not have a role in the household, and they did not attend mosque. Unlike most American families, Mr. Al-Madioum played the role of an interpreter for the parents. He attended medical appointments, meetings with employers,

meetings with attorneys, and whatever else his parents needed of him for. Mr. Al-Madioum did not complain as he felt he had a happy home. There was food on the table, and he was free from physical or emotional abuse.

As noted above, his parents were not aware of Mr. Al-Madioum's plan to leave the family in 2015. In fact, it caught them by surprise. They both agreed to help in whatever way they could and did so. The family allowed the FBI to search their home with their consent. They continued to provide information to the FBI after Abdel left them.

Mr. Al-Madioum's family continues to support him today. The family includes a new member, his baby brother, who was born in 2022. His father works at a factory (for over ten years) and his mother works at a store (last 18 years). His brother Ali is 24 years old and has finished college. His brother Adam is in the ninth grade. The family, other than Ali, has lived in the same home since 2015.

Mr. Al-Madioum's parents have become certified foster parents so they can foster Mr. Al-Madioum's children when they arrive in the United States. His children were found in a Syrian orphanage and are able to video visit every Monday with Abdel's parents. When Mr. Al-Madioum is released from prison, he will live with his family and children. He communicates with his family from Sherburne County Jail by video and phone calls. His family is able to share videos

of his sons with Abdel. Seeing his family almost makes his medical issues seem less, but they are still there.

## Medical

As noted earlier, Mr. Al-Madioum was injured during an explosion. As noted in paragraph 67 of the 2021 PSR, he has many medical issues. His body is shattered.  His right arm was amputated above his elbow. His legs are uneven from shrapnel. He has difficult walking and is constantly in pain. He wears special shoes to walk. Recently, Mr. Al-Madioum was told his right leg will most likely amputated. Aside from his medical issues, he has mental health issues as noted below.

## Mental Health

As time passes, Mr. Al-Madioum notices more things that concern him about his mental well-being. First and foremost, as an 18-year-old, he was in a war. He saw people die. He saw people severely injured. He saw people be tortured. He saw public beatings and killings with crowds cheering. He saw children with weapons. He saw men, women and children be mistreated. He saw death. He witnessed his wife dying before him and their children. He saw his own death as a reality. He has no right arm. He can't walk or run as he previously had. He can't handle hearing doors being slammed. He has anxiety when he hears loud bangs. While at the Midland County Jail, when a door would electronically open, it

sounded like a gun shot. His cell in Sherburne was close to a firing range. Each bang he heard took him back to place he does not want to remember. The last five years, he has not been able to openly discuss his mental health but is willing to do so he can learn how to handle his past trauma effectively.

**Sentencing Disparities**

Mr. Al-Madioum's requested sentence is appropriate in comparison to the sentences of other ISIS Affiliates. 18 U.S.C. § 3553(a)(6) recognizes a need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. As of 2023, 11 adults, including Mr. Al-Madioum, have been formally repatriated to the U.S. from the conflict Syria and Iraq to face charges for terrorism-related crimes and alleged affiliation with ISIS. Mr. Al-Madioum's requested sentence is appropriate here when comparing his case to that of these other individuals in terms of the extent of their involvement with and power within ISIS and their accountability and cooperation after arrest.

The following table summarizes critical details and information on the ten other individuals who were repatriated and charged with terrorism related crimes.

| Defendant's Name | Case No. | Sentence Length | Relevant Facts |
|---|---|---|---|
| Emraan Ali | 21-CR-20123 (Southern District of Florida) | 20 Years | Mr. Ali was sentenced on March 28, 2023, after pleading guilty to conspiracy to provide material support to ISIS in violation of 18 U.S.C. § 2339B(a)(1). He |

| | | | provided support by bringing his family, including young children, to Syria to join ISIS. He enrolled his 12 and 14-year-old sons as child soldiers for ISIS and married off his 14-year-old daughter to another ISIS soldier. He also trafficked weapons in support of ISIS and helped finance ISIS operations. |
|---|---|---|---|
| Jihad Ali | 21-CR-20109 (Southern District of Florida) | 5 Years | Mr. Ali is the son of Emraan Ali and became a child soldier for ISIS in 2015 when he was 14 years old. He joined an ISIS battalion, and, in or around 2018-2019, he fired his weapon on behalf of ISIS against U.S. led coalition forces. He was sentenced on September 30, 2021, after pleading guilty to Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 371 and 2339B(a)(1). It is unknown whether Mr. Ali cooperated with the government. |
| Xavier Pelkey | 22-CR-50 (District of Maine | 15 years | Mr. Pelkey was sentenced to 15 years in prison on November 6, 2022 after pleading guilty to conspiring to provide material support to terrorists in violation of 18 U.S.C. §§ 2339A(b), 2332a and 2332b. He conspired with two minors to conduct a mass shooting at a Shia Mosque in the Chicago area and planned to contribute firearms, ammunition, and explosives to be used in the attack. Pelkey was a supporter of ISIS, and a search warrant recovered written statements claiming the planned attack in the name of the terrorist organization. |

| Ruslan Maratovich Asainov | 19-CR-402 (Eastern District of New York) | Life in Prison + 70 Years | Mr. Asainov was sentenced on October 17, 2023, for Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 2339B(a), two counts of Provision and Attempted Provision of Material Support to ISIS, one count of Receipt of Military-Type Training from ISIS in violation of § 2339D(a), and one count of Obstruction of Justice in violation of § 1512. He was found guilty by jury verdict for all five counts of the indictment. He served as an ISIS sniper and fought in several battles on behalf of ISIS. He was involved in training other ISIS members. At trial, he maintained his allegiance to ISIS to court personnel and stated ISIS would rise again. Mr. Asainov did not cooperate with the U.S. government. |
|---|---|---|---|
| Warren Christopher Clark | 19-CR-2 (Southern District of Texas) | 10 Years | Mr. Clark was sentenced on February 8, 2024, after pleading guilty to Receiving Military-Type Training from a Foreign Terrorist Organization in violation of 18 U.S.C. §§ 2330D and 3238. He traveled to Syria in 2015 and received religious and military training. He was ultimately captured in 2019, and the extent of Mr. Warren's cooperation with the U.S. government is unknown, and the documents are sealed. Mr. Al-Madioum was asked to be on "standby" as a witness in this trial. |
| Samantha Marie Elhassani | 19-CR-159 (Eastern District of Virginia) | 6.5 Years | Ms. Elhassanni was sentenced on November 12, 2020, after pleading guilty to Financing of Terrorism and Aiding and Abetting in violation of 18 U.S.C. § 2339C. She made multiple trips to Hong Kong and transported more than $30,000 in cash and |

| | | | |
|---|---|---|---|
| | | | gold from the U.S to help her husband and his brother join and finance ISIS. |
| Allison Fluke-Ekren | 22-CR-92 (Eastern District of Virginia | 20 Years | Ms. Fluke-Ekren was sentenced on November 1, 2022, after pleading guilty to Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 2339B. She served as a leader and organizer of a military battalion that trained women and girls how to use assault rifles, grenades, and suicide vests for attacks in Syria and other countries, including attacks on universities. It does not appear Ms. Fluke-Ekren cooperated with the government. |
| Ahmad Khalil Elshazly | 20-CR-71 (District of Connecticut) | Sentencing on May 7, 2024 | Mr. Elshazly pleaded guilty on November 30, 2022 to knowingly attempting to provide material support or resources to work under the terrorist organization's direction or control or to organize, manage, supervise, or otherwise direct the operation of that organization, in violation of 18 U.S. § 2339B(h). He pledged allegiance to the terrorist organization and its leadership in online messages and paid $500 to a person he believed was an ISIS facilitator who would be able to smuggle him to Turkey and connect him with ISIS members that would assist him in traveling to Syria. He was arrested in Connecticut as he planned to begin his travels. |
| Mohamad Jamal Khweis | 16-CR-143 (Eastern District of Virginia) | 20 Years | Mr. Khweis was found guilty by jury trial on all three counts of the indictment and sentenced on June 28, 2022, for Conspiracy to Provide Material Support to ISIS in violation of 18 U.S.C. § 2339B, Providing and Attempting to Provide Material |

| | | | |
|---|---|---|---|
| | | | Support to ISIS also in violation of 18 U.S.C. § 2339B, and Possessing Firearms in Furtherance of a Crime of Violence in violation of 18 U.S.C. § 924(c). Mr. Khweis joined ISIS in December of 2015 and served as a soldier for ISIS for two and a half months. In that time, he also volunteered to be a suicide bomber but was ultimately captured by Kurdish forces in Iraq in March of 2016. Once captured, he fabricated stories to exculpate himself and gave several hours of perjured testimony during the prosecution of his case. It does not appear Mr. Khweis cooperated with the government. |
| Ibraheem Izzy Musaibli | 18-CR-20495 (Eastern District of Michigan) | 14 Years | Mr. Musaibli was found guilty by jury trial for Providing and Attempting to Provide Material Support to ISIS also in violation of 18 U.S.C. § 2339B and sentenced June 15, 2023. In sentencing, the court found he expressed remorse and a desire to carry on with his life and held the maximum sentence was unnecessary to achieve the goals of the guidelines. Mr. Musaibli spent at least nine months fighting for ISIS on the front lines and admitted to using his weapon while serving ISIS. Mr. Al-Madioum testified at the motion hearing and was waiting at the courthouse to testify during trial, but was not called. |
| Sinmyah Ceaser | 19-CR-117 and 17-CR-48 (Eastern District of NY) | 48 months (re-sentencing on July 24, 2024) | Pled guilty to providing material support to ISIS. While on Pretrial Release, Ceaser continued to contact ISIS members. She pled guilty to obstruction of justice and faced 360 to 600 years in prison. She was sentenced to 48-months. Her offense conduct included using social media to recruit and connect people in the US with |

| | | | ISIS members. She was arrested at JFK airport on her way to join ISIS. |
|---|---|---|---|
| Benjamin Ryan Teeter & Michael Solomon | 20-CR-193 (District of MN) | 4 years | Defendants believed they were in contact with members of Hamas to buy weapons. They planned on attacking a federal courthouse in Minnesota. Both cooperated |

Taking the facts from the table above into consideration, the facts surrounding Mr. Al-Madioum's case are most analogous with those who received shorter sentences, and his circumstances are notably different from those who received longer sentences.

The first factor to note is the extent to which Mr. Al-Madioum provided support to ISIS and his lack of power and authority within the organization compared to other defendants. Mr. Al-Madioum's role under ISIS did not involve any type of leadership, and he was not a high-ranking member. He noted that higher-ranking officials hoarded resources, but he was amongst the class of members who struggled for food and supplies and had to beg for rations. (PSR 11). Moreover, Mr. Al-Madioum did not lead a battalion, take part in recruiting new members or traffic weapons, and he did not implicate minor children in his conduct. He served in a soldier role for less than two months before he was severely injured by an explosion, losing his right arm, and acutely injuring his legs and rendering him hospitalized for approximately five months and incapable of

further service. (PSR 12). Given his status as a low-ranking member, the short length of his military service, and his lack of involvement in recruiting or other leadership positions, a downward variance is appropriate to avoid sentencing disparities when comparing the severity of conduct to other defendants above.

Finally, Mr. Al-Madioum is markedly different from many other defendants in the magnitude of his cooperation and acceptance of responsibility. Since his surrender on March 15, 2019, he has been forthcoming with information to U.S. officials about ISIS. While detained in Syria, he provided the U.S. officials with information regarding other ISIS members, and he has continued to provide valuable inside information to U.S. officials about ISIS to date—possibly saving countless lives. He has also testified against other ISIS members, namely Ibraheem Izzy Musaibli, at trial to aid in prosecution.

Mr. Al-Madioum has also accepted responsibility by pleading guilty and aiding in the prosecution of his case rather than by dragging out legal proceedings or having a jury trial. Mr. Al-Madioum recognizes there is no one to blame for his actions but himself, and he is remorseful and apologetic to both the U.S. government as well as his family and children for what he has put them through. For him, it is "both humbling and humiliating at the same time" to recognize the government he betrayed and rebelled against is the same government that saved

his life by extraditing him back to the U.S., the same government that found his children for him in a refugee camp in Syria after all the wrongs he has done.

Moreover, Mr. Al-Madioum's acceptance of responsibility differentiates him from other defendants in that, outside of prison, he presents a unique benefit through de-radicalization work. In the future, he hopes to work with the U.S. Government in counterterrorism efforts by working with and telling his story to other young people at risk of being recruited or who have been recruited by foreign terrorist organizations like ISIS. He feels that, when he was being recruited, someone like himself would have been the most beneficial person to talk to because he knows all of ISIS's arguments, counter arguments, and the logical fallacies behind them through his own experience, and he can relate to other young Muslim Americans who are being subjected to extremist versions of their religion. Moreover, through the collateral consequences he has faced, he serves as a reminder that, "bad actions have bad consequences. I did the thing, got burned by it, and I learned my lesson, even without prison time." This level of cooperation and acceptance of responsibility creates a rare opportunity for counterterrorism efforts and de-radicalization programs, which supports a lighter sentence than those of defendants with similar convictions.

## ADDITIONAL SENTENCING FACTORS

**BOP CUSTODY CREDIT**

Although a district court imposes a federal term of imprisonment, 18 U.S.C. § 3582(a), the Bureau of Prisons (BOP) calculates the sentence and applies any applicable credits, 18 U.S.C. § 3585. To do so, BOP follows a number of statutes, regulations, and policies.[2] Of particular note here, Program Statement (Prog. Stat.) 5880.28 serves as BOP's "Sentence Computation Manual."[3] And under this Manual, subject to exceptions that do not appear applicable here, BOP policy dictates: "Credit will not be given for any portion of time spent serving another sentence[,] regardless of whether the sentence is federal, state, or foreign." Prog. Stat. 5880.28, at 1-17; *see also Kendrick v. Carlson,* 995 F.2d 1440, 1444-47 (8th Cir. 1993) (under predecessor statute, upholding BOP denial of custody credit for foreign sentence). Hence, it is unlikely that BOP will incorporate credit from Mr. Al-Madioum's term of imprisonment in a Syrian prison, in calculating any prison sentence imposed by the Court.

However, the Court *does* have authority to remove the administrative ambiguity entirely, by adjusting the sentence imposed under USSG § 5G1.3(b)(1):

---

[2] https://www.bop.gov/inmates/custody_and_care/sentence_computations.jsp

[3] https://www.bop.gov/policy/progstat/5880_028.pdf

the court *shall* adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons.

(Emphasis added). As the above language indicates, when applicable, the procedural requirement to make the § 5G1.3(b)(1) adjustment is mandatory (though the district court retains discretion to vary above or below the post-adjustment sentence). *United States v. Winnick,* 954 F.3d 1103, 1104-05 (8th Cir. 2020) (explaining the required procedure, step-by-step). In effect, this provision permits a sentencing court to give a defendant credit for prison time served under a related foreign offense and sentence. *See, e.g., Shkambi v. Garland,* 2023 WL 6383828, at *1 (N.D. Ohio Sept. 29, 2023) ("Prior to sentencing, Petitioner sought a downward departure from the Sentencing Guidelines because the same heroin on which his Albanian conviction was predicated was used to convict him here in the United States. The sentencing court agreed, and Petitioner was sentenced to 324 months imprisonment, which included a 36-month adjustment for time served on his Albanian conviction as provided by USSG § 5G1.3(b)." (record citations omitted)).

In this case, Mr. Al-Madioum was in a foreign prison for 18-months and he is requesting that time be considered when imposing a sentence.

**Harsh Conditions in Syrian Prisons**

Mr. Al-Madioum respectfully asks that the Court consider his time in Hasakah prison in Syria when imposing a sentence given the deplorable conditions he was detained in for 18 months. Departures based on conditions of confinement are not addressed in the sentencing guidelines, but there is room within the framework to factor such circumstances into sentencing. The Appellate Court held, "If a factor is unmentioned in the guidelines, the court must, after considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole, decide whether it is sufficient to take the case out of the Guideline's heartland. *United States v. Dyck*, 334 F.3d 736, 742 (8th Cir. 2003) (citing *United States v. Buckendahl*, 251 F.3d 753, 758 (8th Cir. 2001). District courts can depart from the applicable range when they find "mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines." 18 U.S.C. § 3553(b). The Eighth Circuit has not directly confronted the issue of pre-trial confinement as a factor for departure, let alone confinement conditions in foreign prisons. However, the nature of Mr. Al-Madioum's confinement in Syria is so severe and abnormal as to create justification for consideration in taking this case out of the heartland. Moreover, while the Eighth Circuit is silent on the issue, our sister circuits have held pretrial conditions as an appropriate consideration: "[T]he district court was

correct in holding that conditions of confinement could provide a basis for departure, since the factor was apparently not taken into account by the Sentencing Commission and could be unusual enough to take the case out of the heartland of the applicable guideline." *United States v. Pressley*, 345 F.3d 1205, 1218 (11th Cir. 2003). The Second Circuit has held the same, stating, "[W]e hold today that pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *United States v. Carty*, 264 F.3d 191, 196 (2nd Cir. 2001).

Mr. Al-Madioum suffered several severe collateral consequences because of his involvement in ISIS: namely, the loss of his arm, disfigurement of his legs, and the death of his wife. However, he maintains that one of the worst experience of his life was his 18-month detention in Syria. (PSR, 12). The following photographs are from the prison he served his time: https://www.cbsnews.com/pictures/inside-a-syrian-prison-for-isis-suspects/9/

## Prison full of ISIS suspects



CBS/THORSTEN HOEPLE



Notably, while in the prison, he met men who had been detained in the infamous Abu Ghraib prison in Iraq[4] and told him the conditions in Hasakah prison were far worse. It is treatment and conditions this heinous that take his case out of the Guideline's heartland and warrant greater consideration.

After surrendering to the Syrian Democratic Forces on March 15, 2019, Mr. Al-Madioum and his two young children were placed in Hasakah prison and locked in a small and crowded room with other captured ISIS members. Many of these men were dying from pre-existing injuries, and Mr. Al-Madioum remembers some men with their intestines out of their bodies and others with greatly infected wounds, which were only exacerbated by the extreme heat and humidity and human feces all over the ground. For their safety, Mr. Al-Madioum's children were taken by guards to a loosely organized refugee camp on March 16, 2019, and he has not seen them since. (PSR ¶62).

In the 18 months spent at the prison, Mr. Al-Madioum nearly died on several occasions from asphyxiation, malnutrition, and lack of water. The food and water supply would often be cut off, and men would resort to drinking their own urine

---

[4] Abu Ghraib prison is a notorious detention facility that gained global attention due to the abuse, torture, and murder of detainees by United States military personnel during the war in Iraq. The prison became widely known in 2004 when photographs depicting this mistreatment were leaked to the media, showing prisoners subjected to acts of humiliation, sexual abuse, and mock executions. Adam Volle, *Abu Ghraib prison*, Britannica, Aug. 1, 2023, https://www.britannica.com/topic/Abu-Ghraib-prison.

to survive. Mr. Al-Madioum, now weighing approximately 165 pounds, weighed around 100 pounds in the prison because food was so scarce. The food he did receive was cooked over burning tires, and the water was often contaminated with diesel after being stored in fuel tanks. At night, Mr. Al-Madioum and approximately 10 other men were forced to share three cots and sleep piled on top of one another. For his pre-existing injuries, Mr. Al-Madioum received little to no treatment, and the treatment he did receive was futile against the unsanitary conditions of the prison. (PSR ¶ 62).

In addition to these conditions, violence in the prison was rampant, uncontrollable, and perpetrated on all sides. Guards beat Mr. Al-Madioum and other prisoners at random for innocuous violations and tortured them to extract information. Guards threatened to harm Mr. Al-Madioum and forced him and others to stand and sit in stress positions for extended periods of time. Riots would break out and former ISIS members would strangle and murder those they felt were too friendly with the guards. Among those imprisoned were boys as young as 8 years old, who were held in the same area as adult men. Thus, child sexual abuse was widespread and unrestrained, and oftentimes this abuse was perpetuated by guards as well as detainees. (PSR ¶62).

Mr. Al-Madioum was taken from the prison in Syria and extradited back to the United States in September of 2020. At the time, he was unsure where he was

going but recalls the prayer beads he was given said "Made in U.S.A. " and experienced a rush of hope and humility. He has been incarcerated in Sherburne County Jail since September 16, 2020, and he cannot express enough gratitude for the improved conditions. He likens his experience in Sherburne to that of a hotel compared to the Syrian prison. He is grateful for the quality of the medical attention and treatment he has received, the kindness of the guards, and the adequacy of nutrition. This experience has made him appreciative of the rights Americans have, and he is working on overcoming the trauma of his experience in Syria. It is because of the severity of this traumatic experience that Mr. Al-Madioum asks the Court for a departure based on his pre-trial confinement in Syria.

**Pretrial Confinement at Local Jails**

Mr. Al-Madioum has been in custody in the United States since September 2020. He has been held at the Sherburne County Jail and the Midland County Jail in Michigan. The jails do not allow any outdoor activity, no in-person family visits, and programming is very limited. His pretrial confinement has been lengthy because of his cooperation but should be considered as another factor in supporting a downward variance.

**Criminal History VI**

The PSR accurately reflects the reality that, prior to the offense of conviction here, Mr. Al-Madioum has a clean record. (PSR at 7). No adult charges or convictions. (PSR at 7). No juvenile charges or adjudications. (PSR at 7). No criminal history at all. (PSR at 7). And yet, under the Guidelines, Mr. Al-Madioum has been assigned a criminal history category (CHC) VI, (PSR ¶ 40), the highest one possible, and corresponding to the most elevated array of advisory sentencing ranges, USSG § 5A.

The reason for this anomalous outcome—*i.e.,* a defendant with a clean criminal history being assigned the highest USSG criminal history category—lies with USSG § 3A1.4(b), the terms of which call for indiscriminate use of CHC VI in all situations involving a "federal crime of terrorism" as defined by federal statute. USSG § 3A1.4 & App. N. 1, 3 (citing to, *inter alia*, 18 U.S.C. § 2332b(g)(5), which cross-references the statute of conviction at issue here).

However, the Court is not bound to any such Guidelines-driven anomaly, and instead is authorized to impose a downward-variance under the 18 U.S.C. § 3553(a) traditional sentencing factors. *United States v. Gall,* 552 U.S. 38, 46 (2007). A district court is to impose a sentence that is "sufficient, but not greater than necessary" to "serve the four overarching aims of sentencing," as reflected in § 3553(a)(2)(A)-(D). *Dean v. United States*, 581 U.S. 62, 67 (2017). "Traditional

sentencing factors often involve * * * characteristics of the offender," such as "recidivism" (or lack thereof) as reflected in a defendant's criminal history. *Castillo v. United States,* 530 U.S. 120, 126 (2000).

"A district court has substantial leeway in deciding how to weigh the § 3553(a) factors[.]" *United States v. Sholds*, 827 F.3d 758, 760 (8th Cir. 2016). And a sentencing court is permitted to vary based upon conduct that spans across § 3553(a) factors, such as the nature and circumstances surrounding a defendant's criminal history. *United States v. Feemster,* 572 F.3d 455, 463-64 (8th Cir. 2009). Moreover, a district court may reject an advisory Guidelines range entirely in the § 3553(a) analysis; particularly when the Guideline provision is of doubtful provenance, or where the facts do not constitute a "mine-run" or "heartland" case contemplated by the Guideline(s) in question. *Kimbrough v. United States*, 552 U.S. 85, 109-10 (2007).

Here, as noted above, operation of USSG § 3A1.4(b) calls for the highest criminal history category, even though Mr. Al-Madioum has no pre-offense criminal history at all. (PSR at 7). And § 3A1.4 does so while simultaneously increasing a defendant's offense levels by 12, with a minimum total-offense-level (TOL) of 32. § 3A1.4(a). Thus, no matter a given defendant's individualized circumstances under the § 3553(a) traditional sentencing factors (*e.g.,* lack of criminal history), § 3A1.4 imposes a _minimum_ criminal history category VI and

TOL 32, corresponding to a minimum advisory range of 17.5 to nearly 22 years for a term of imprisonment. USSG § 5A (sentencing table).

In the present advisory USSG regime, however, any given Guidelines provision is subject to judicial scrutiny to determine whether it is or is not the product of the United States Sentencing Commission's "institutional role," *i.e.,* based upon "empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough,* 552 U.S. at 108-10. If not, then a district court acts well within its sentencing discretion in disregarding the offending provision at the § 3553(a) variance stage, and instead crafting a sentence based upon some reasoned formulation of the traditional sentencing factors. *Id.*

USSG § 3A1.4 falls under the category of Guidelines provisions that finds no grounding in empirical data or national experience, as determined by the Sentencing Commission in its professional and institutional capacity. The provision was first added in 1995 in response to a congressional enactment which called upon the Sentencing Commission to "provide an appropriate enhancement" for any felony involving "international terrorism," and in its original form merely authorized an unspecified "increase [in] the sentence above the authorized guideline range." USSG, App. C, Am. 526. However, the next year Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132 (Apr. 24, 1996), including one provision which calls for

an "emergency amendment" to broaden the scope of covered "crimes of terrorism." AEDPA, § 730; USSG, App. C, Am. 539. The Sentencing Commission did so, but simultaneously and without explanation, also implemented the present version of § 3A1.4, calling for indiscriminate increases in both offense level *and* to maximal CHC, as described above. USSC, *Amendments to Sentencing Guidelines—Interim Publication*, at 5-6 (1996).[5]

Counsel has been unable to uncover literature—from the Sentencing Commission or case law—offering any empirical justification for the dual-dimensional § 3A1.4 enhancement. And in particular, the indiscriminate imposition of the maximal criminal history category, regardless of the defendant's actual criminal history. Nor have sentencing courts, judging by the recent decisions to have examined this same topic. *See, e.g., United States v. Dais,* 482 F.Supp.3d 800, 802-03 (E.D. Wis. 2020) (§ 3A1.4 "was enacted pursuant to a congressional directive and absent empirical evidence," such that it does "not exemplify the Sentencing Commission's exercise of its characteristic institutional role" and hence is "generally entitled to less respect"); *United States v. Alhaggagi,* 372 F.Supp.3d 1005, 1014 (N.D. Cal. 2019) ("The terrorism enhancement is not backed by any empirical evidence."), *vacated and remanded on other grounds,* 978

---

[5] Available at https://www.ussc.gov/guidelines/archive

F.3d 693, 704 (9th Cir. 2020); *United States v. Jumaev,* 2018 WL 3490886, at *10 (D. Col. July 18, 2018) ("I have two principal objections to this operation of the Terrorism Enhancement. First, it is not backed by any empirical evidence. And second, treating all 'terrorists' alike is impermissible under our sentencing paradigm * * *." (citations and footnotes omitted)).

Beyond this, the criminal-history-enhancing aspect of § 3A1.4 lacks even so much as a sound theoretical grounding. That is to say, terrorism-related offenses are certainly serious in nature, such that one could at least plausibly defend an increase and/or floor in offense levels, as found in § 3A1.4(a). By contrast, the indiscriminate increase to maximal Criminal History Category VI under § 3A1.4(b) lacks any empirical _or_ logical basis. As one court has said:

> [I]t is the _offense level_ that reflects the seriousness of a charged offense.
> * * * A defendant's _criminal history category_ reflects something
> different. * * * If terrorism sentences are too low, the Sentencing
> Commission can recommend increasing the offense level for those
> crimes. But automatically increasing a defendant's criminal history to
> reflect the seriousness of the charged offense is inappropriate, as it
> does not reflect—unlike every other offense—the seriousness of the
> defendant's previous criminal convictions.

*Alhaggagi,* 372 F.Supp.3d at 1013-14; *accord Dais,* 482 F.Supp.3d at 802-03.

The above observation is quite accurate, under both traditional sentencing considerations and the internal logic of the Guidelines themselves. Prior criminal history is deemed significant for present sentencing purposes due to "extant empirical research assessing correlates of recidivism and patterns of career

criminal behavior." USSG § 4A (introductory commentary). Hence, the Guidelines seek to impose the most punitive sentencing ranges upon those defendants who have amassed prior convictions in unusual large numbers, §§ 4A1.1 to .3, or in unusual seriousness, §§ 4B1.1(b) (career offender), .4(c) (armed career criminal), .5(a)(2) (repeat/dangerous sex offender). However, § 3A1.4(b) radically departs from that same internal logic, imposing the highest and most severe Criminal history category VI upon *any and all* defendants who fall within its scope, regardless of whether the defendant has lengthy criminal history or, as in the case of Mr. Al-Madioum here, none at all.

The above decisions have thus correctly observed the indiscriminate criminal-history-enhancement of § 3A1.4(b) finds no criminological justification. Not in empirical studies. Nor in traditional sentencing considerations. Nor in the internal logic of the Guidelines themselves. Hence, for purposes of a § 3553(a)-variance sentence requested here, Mr. Al-Madioum respectfully requests that the Court begin from a place of objective reality instead of legal fiction, *i.e.*, that prior to the instant offense he has a clean criminal history, and his advisory Guidelines range should be re-calculated for variance purposes to reflect that objective reality.

**Youthful Offender**

Under 18 U.S.C. § 3553(a), the overriding objective of a sentencing court is to "impose a sentence sufficient, but not greater than necessary," to satisfy the

traditional and statutory purposes of criminal punishment. To this end, a sentencing court is tasked with considering a number of statutory factors which inform the inquiry, including: (i) "the history and characteristics of the defendant," § 3553(a)(1); (ii) "just punishment for the offense," § 3553(a)(2)(A); and (iii) "to provide the defendant with needed * * * correctional treatment," § 3553(a)(2)(D). All of these § 3553(a) factors—and others as well—call upon a sentencing court to consider the defendant's youth at the time of the offense conduct. *See, e.g., United States v. Feemster*, 572 F.3d 455, 459-60 & 462-64 (8th Cir. 2009) (upholding major downward variance—from 360-month advisory term to 120-month term imposed—based largely upon defendant's youth at the time of offense conduct (age 26) and at time of prior offense conduct (beginning age 17)).

The rationale for considering a defendant's youth when conducting the § 3553(a) analysis is, in large measure, the product of common understanding and judicial experience, *i.e.*, "youth is wasted on the young" such that many a youthful offender may be redeemed with the opportunity for accumulation of "a little wisdom." *Id.* at 459. Of late, courts have increasingly bolstered these traditional rationales, incorporating scientific and empirical data into the analysis. This can be seen, for example, in the Supreme Court's line of Eighth Amendment cases, as applied to defendants who were under age 18 at the time of offense conduct. *See, e.g., Miller v. Alabama*, 567 U.S. 460, 471-72 (2012).

In the § 3553(a) sentencing context at issue here, the term "youthful offender" is not limited to persons who were under age 18 at the time of offense conduct. *Feemster,* 572 F.3d at 459-60 & 462-64 (major downward variance, in large measure due to defendant's relative youth of age 26 at the time of offense conduct). And as above, it is appropriate for a sentencing court to supplement its common experience with brain science and empirical data relating to such youthful offenders, when warranted. *United States v. Ramsay,* 538 F.Supp.3d 407, 423 (S.D.N.Y. 2021).

In this case, Abdel was just 18 years old at the time of the offense conduct and 22 year old when the offense conduct stopped. This places him squarely within the category of a "youthful offenders," as defined by the United States Sentencing Commission. USSC, *Youthful Offenders in the Federal System*, at 1 (May 2017) (presenting "information about youthful offenders, who for purposes of this report are defined as persons *age 25 or younger* at the time they are sentenced in the federal system").[6] The extension of the term "youthful offender" to a person who committed an offense in his mid-20s is not some arbitrary designation, but rather supported by neuroscience and other empirical evidence. *Id.* at 6-7. Evidence which continues to be replicated and expanded upon, in study after

---

[6] https://www.ussc.gov/research/research-reports/youthful-offenders-federal-system

study. *See, e.g.,* Nat'l Acad. of Sci., Eng'g & Med., *The Promise of Adolescence: Realizing Opportunity for All Youth,* at 1 (2019) (defining "adolescence" as a critical period of brain development, "beginning with the onset of puberty and ending in the mid-20s").[7]

More recent research casts doubt upon the criminological efficacy of imposing lengthy prison terms upon youthful offenders,[8] notes the adverse outcomes associated with the same,[9] and observes the broader societal costs of depriving youthful offenders of opportunities for personal development during a critical stage of life.[10]

The question may then arise, how best to account for the defendant's youth, when applying the § 3553(a) factors? At least one court has effectively surveyed the above case law and other authorities, and offered the following:

1. *Immaturity.* The extent to which the defendant evinces a "lack of maturity and an underdeveloped sense of responsibility," resulting in "impetuous

---

[7] https://nap.nationalacademies.org/catalog/25388/the-promise-of-adolescence-realizing-opportunity-for-all-youth

[8] https://www.sentencingproject.org/reports/why-youth-incarceration-fails-an-updated-review-of-the-evidence/

[9] https://publications.aap.org/pediatrics/article-abstract/139/2/e20162624/60093/How-Does-Incarcerating-Young-People-Affect-Their?redirectedFrom=fulltext

[10] https://www.annualreviews.org/doi/pdf/10.1146/annurev-lawsocsci-101317-031101

and ill-considered actions and decisions," which might be expected to fade as the person advances in age.

2. *Susceptibility.* The extent to which the defendant's actions may be said to have stemmed from a youthful person being "more vulnerable or susceptible to negative influences and outside pressures, including peer pressure," which again might be expected to fade with advancing age.

3. *Salvageability.* The extent to which the defendant's actions may be said to have been grounded in "transitory" personality traits of a not-fully-developed mind, requiring consideration that "their youthful character deficiencies will be reformed."

4. *Dependence.* The extent to which the defendant's actions may be explained by the environment in which he was born and raised, such that a change in environment might alter his trajectory.

*Ramsay,* 538 F.Supp.3d at 417-23.

Mr. Al-Madioum was 17 almost 18 years old when he was influenced by social media post of an ISIS recruiter. He does not place sole blame on the recruiter, as Mr. Al-Madioum did his reading on the Assad Regime.  But  given his age, it was easy to influence and sway him by playing the "its your duty" "it is your duty as a Muslim" "it is your duty as Muslim man" to help those in need in Syria. He was highly susceptible and was immature at age 18. Once he was in Syria, he continued with his beliefs and was a solider and worked for the administration. As he became a father and husband, his role with ISIS became less. As his brain aged, he began to look at his life in a different lens. At age 22, he did do the right thing, and surrendered. At age 24, he continued to do the right thing and

cooperated. Today, back in the Untied States and back with his parents, his trajectory has changed. It has changed for the better.

## LENTGH OF SUPERVISION TERM

A term of supervision of 5 years to life can be imposed pursuant to 18 U.S.C. § 3583(k). Mr. Al-Madioum is requesting a term of 10 years of supervision to follow his imprisonment. Citing 18 U.S.C. § 3583(k), the PSR states the Court is required to impose a minimum 5-year term of supervised release, and is permitted to impose up to a life term of supervision. (PSR ¶ 85). However, the statute of conviction at issue here is 18 U.S.C. § 2339B(a)(1), which is not listed under § 3583(k); hence, the defense respectfully requests that the Court rule that the 5-year minimum term of § 3583(k) is not applicable here.

However, under § 3583(j), "the authorized term of supervised release for any offense listed in section 2332b(g)(5)(B) is any terms of years of life." The latter subsection defines the statutory term "Federal crime of terrorism," and includes the § 2339B statute of conviction at issue here. 18 U.S.C. § 2332b(g)(5)(B)(i). Hence, the defense respectfully believes the Court should rule the permissible supervised-release term to range from zero to lifetime. § 3583(j).

That being said, under the advisory guidelines a supervision term from 1 to 3 years in duration is recommended for the Class C felony at issue here. USSG § 5D1.2(a)(2). In the case of a "Federal crime of terrorism" such as the statute of

conviction here, the Guidelines purport to mandate at least the minimum supervised release term above. § 5D1.2(b)(1).

To pinpoint the appropriate Supervised Release term within the applicable minimum and maximum a sentencing court is called upon to consider a number of the traditional sentencing factors. 18 U.S.C. § 3583(c). Specifically:

- Nature/circumstances of offense, and history/characteristics of the defendant;

- Need to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

- Need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;

- Need to provide restitution to any victims of the offense.

18 U.S.C. § 3583(c) (incorporating select provisions of § 3553(a)); USSG § 5D1.2, App. N. 4 (incorporating USSG § 5D1.1, App. N. 3)).

"The court should give particular consideration to the defendant's criminal history (which is one aspect of the 'history and characteristics of the defendant' * * above). In general, the more serious the defendant's criminal history, the greater the need for supervised release." USSG § 5D1.1, App. N. 3(B). And by logical extension, under that same Guidelines policy rationale, a defendant with less serious criminal history has lesser need for supervision. *See id.*

Mr. Al-Madioum's dangerous offense conduct occurred in 2015, and his

continued offense conduct concluded in 2019. Since that time, he rehabilitated himself. This has been accomplished by being in prison for five years (both in Syria and the United States), his extensive cooperation, his self-education and the continued support of his family. However, he will benefit from the services of the United States Probation Office. Mr. Al-Madioum is need of mental health therapy; he has been in custody for five years and will need time to adjust to his community; he will need job training; he will need assistance in obtaining current identification; and medical treatment. A ten-year term of supervision will also continue to assure the safety of the community. Counsel does have a copy of suggested conditions of supervision and will therefore not address the issue in this pleading.

## RECOMMENDATIONS TO THE BOP

Mr. Al-Madioum is requesting that the Court recommend to the Bureau of Prisons that he be housed at FMC Rochester because of his medical needs. Because the PSR was completed in 2021, he is requesting that the Court order Probation to send all updated medical records to the BOP. Counsel has provided medical records to the Probation Office.

## CONCLUSION

Respectfully, Mr. Al-Madioum asks this Court to sentence him to serve seven years in Federal Prison followed by a ten-year term of supervision. His

cooperation is incredibly extensive not only in many districts in the United States but to the other countries that are friends of the United States. He has matured since his offense. He surrendered to authorities. He is now a father. He has educated himself on the wrongs of ISIS ideology. He has acknowledged and welcomed mental health therapy. He is willing to discuss his experience so others will not take his path. He is no longer a danger to the public and he has proven as much through his cooperation. He has been in terrible confinement conditions overseas and suffered immensely while being transported from place to place because of his medical issues. Comparing him to others who have supplied material support also supports a sentence of seven years in prison. His letter to Court is very telling of his mindset today and again, the letter supports a sentence of seven years in prison.

Dated:   April 17, 2024                              Respectfully submitted,

                                                     *s/ Manny K. Atwal*

                                                     _____
                                                     Manny K. Atwal
                                                     Attorney ID No. 282029
                                                     Attorney for Mr. Al-Madioum
                                                     107 U.S. Courthouse
                                                     300 South Fourth Street
                                                     Minneapolis, MN 55415